Good morning, and may it please the Court, my name is Thomas Sarican, and I represent Eric Johnson. We are here today because the police violated Mr. Johnson's rights three times. First, he was subjected to express questioning without the benefit of Miranda of Missouri v. Saber by intentionally subjecting Mr. Johnson to a two-step interrogation process in which his first unwarned statement was used to put him on the hook so that when he later received his Miranda warnings, he would feel unable to exercise his rights and would go on to give a further statement. Do we analyze the initial interchange under Rhode Island v. Ennis? Yes, Your Honor. And so the question is, was the officer's question reasonably calculated to lead to an incriminating result? Reasonably likely to elicit, yes. And, Your Honor, in this case, it absolutely was reasonably likely to elicit. Mr. Johnson is sitting in the unmarked car with three officers, and he says to them, I can help you out. I don't want to go to jail. I have information. Well, he didn't quite say all of that, did he? Were those his exact words? Your Honor, that is, I believe, an accurate summary. I think those are the words the District Court kind of summarized his phrasing as. What's important is that it You argued that that was an involuntary expression on his part? No, Your Honor. That much was volunteered. But that much did not have any criminal content. It didn't put him on the hook. He's only on the hook when the question is asked, what do you mean? And that's when it all goes wrong. Well, but going back to Rhode Island versus Ennis, which you acknowledge is the correct analytical framework, was what do you mean in the, I think it's reasonably calculated to lead to an incriminating result. Isn't that the inquiry? Your Honor, the inquiry, respectfully, is whether it is reasonably likely to elicit incriminating information. And it was. About who? About, about who? This is my question as well. About Mr. Johnson himself. Why? Two points on that, Your Honors. First, because the easiest way for Mr. Johnson to know about criminality is for him to have been involved in it. And second, the, I apologize. Not necessarily, I mean, involved, yes, but not about himself. In fact, I would, if confronted, I would immediately assume it was, that he was offering to function as a CI about someone else. Your Honor, that is possible. Why isn't it actually the more likely scenario? Why would someone in a relative, a situation where he might be on the hook for marijuana, reasonably expected to proffer a gun which carries a much greater penalty? Your Honor, this was much debated in the district court. It goes back to the case cited in our briefing relating to the idea that among kind of those who are concerned about these things in Baltimore, there is a sense that providing the police with guns can kind of get one off the hook, that that's what the police are really looking for, that they will cut a person a deal if they can get a gun. Now, without intending to argue beyond the record, in this case, even if it is not 51% likely that Mr. Johnson is going to say something about himself, necessarily it is the test the district court used, and it's not the test. That word doesn't appear in Innis, and it shouldn't appear in Innis, because the point of Miranda is to maintain this bright line rule, this easy to understand principle, just give the warnings, do it every time, make it easy for everyone, the police, the courts, all down the line. Well, and they might have had the defendant not proffered something, and that's another issue I guess. It reads almost like invited error, because they're riding along, they haven't started questioning him, and all of a sudden the defendant says, I can get you something, I've forgotten the exact words. That's the initiation of the dialogue. Your Honor, that does initiate the dialogue, but it is not a... I can help you out, I don't want to go back to jail, I've got information for you. And he said, I don't want to go back to jail. It sounds as though he is proffering, it still conveys to me that he is proffering somebody else. Your Honor, that is one possibility. But another possibility is that he is offering something about himself. And the police don't have enough information at that point to know which it is, but there is certainly a reasonable likelihood that what Mr. Johnson is going to come out with is, I can give you something about myself. And it might not be a gun at that point, the police don't know, but it certainly has the reasonable likelihood of being about himself, and that danger... Seems to be completely counterintuitive. I mean, it just makes no sense for someone to say, well, maybe I'm facing a small-time misdemeanor, but in order to extricate myself from that, let me give you a felony about myself. I mean, it just doesn't make any sense. Your Honor, I agree that strategically, it is not necessarily the move one should make, but again, whether it is strategically wise is also not the test. But it's... Is it reasonable... The test is... And the test is, was it reasonably calculated to lead, I believe. And what are you talking about, or the functional equivalent thereof, is a fairly minimal response to, I have something for you, I can get you something, I can help you out. Your Honor, it is brief and perhaps even natural that the police would want this information. Well, that they would want to know what it is, because all they asked is, what do you mean? Right, and I apologize, that's what I mean, it's natural to ask. But even given that it is natural, there is this danger to the whole Miranda process, when the officers say, well, this is just natural, there's some... The whole point of... Miranda's a prophylactic rule, and it... The evil at which it's aimed is custodial interrogation, where police are really bearing down on someone, and the questions that they're asking would actually compel someone to incriminate themselves. So, the idea of Miranda is to forestall compulsion, and asking somebody, what do you mean? Are they giving somebody a fifth degree, or are they really bearing down with questions? Is there any real prospect that just saying, what do you mean, is going to be the kind of sort of coercive sequence or coercive officer conduct at which Miranda's aimed? In other words, but this is pretty innocuous. I mean, it's about as sort of ordinary and innocuous as it can get. And it's not as if they didn't give Miranda warnings, they did. Your Honor, it is true that they did not give him the third degree, and we do not allege that there is anything of that sort. But Miranda does speak to the compulsion that is inherent in incommunicado interrogation. And this absolutely is that situation. Whether it was why, oh I apologize. It was initiated by him. That's the whole point. It wasn't, he was the one that spoke up. The officers weren't saying a thing until he said, I've got, I don't want to go back to jail, I've got some information for you. That could cover the whole universe of things. And it doesn't, I don't, I mean, Miranda wasn't aimed at that kind of offhand comment. But I mean, here the officers eventually gave Miranda warnings. And what exchange there was, was initiated by Mr. Johnson. Your Honor, it's true that Mr. Johnson initiated the exchange, but that is not to say that forever thereafter, any further question is simply permissible because he started it. I think you would find, or you would certainly find me in complete agreement with that. The problem that I have is Miranda is aimed at addressing, ensuring that conduct is voluntary. That it's not coerced, it's voluntary. And it's hard for me to see on these facts that this was anything other than voluntary. It was proffered. And perhaps in hindsight, it would have been better for the officers to give the Miranda warnings immediately. It would have been, what are you saying? Which I'm still having difficulty with as reasonably likely to elicit incriminating, self-incriminating. I would have thought it would elicit exculpatory or information pointing the finger at someone else. But I've made that point. I'm sorry, I was just going back to the voluntariness. And the problem that I'm having with the defendant being the person who initiated the conversation and not, it didn't, the Miranda line isn't attempted to be drawn at great length. It's a pretty discrete period of time. That is true, Your Honor. And while Miranda is designed in the first instance to stop us from going to the third degree, it's also designed to make sure people can exercise their rights in an informed way, that they have the ability to exercise. And they did. I mean, they immediately, he immediately got a Miranda warning and another officer said, shut up until we get to the station. But by then it was too late, Your Honor. But that was his fault. Yeah. Okay. I take your argument. I find it a difficult one. I understand, Your Honor. I see my time is ticking down. If I may just say briefly, and I understand that there might be more to discuss about the initial statement, but I did want to be sure to say that with regard to the second statements, that we submit that the officers were using a two, oh. Which one is you, what are you saying is the second statement now? Statements back at the station, Your Officer, after, I'm sorry, Your Honor, after the warnings have been given. And this goes back, Your Honor, to hindsight and the idea that maybe it would have been better for the officers to just give the warnings up front. And why didn't they? Well, one possibility is that they thought, you know, oh, we don't need to yet. But another possibility is that they were waiting. But the whole idea of Miranda, you know, before, the law before Miranda had all of these very complicated totality of the circumstances, inquiries into voluntariness. And one of the rationales of Miranda was, look, if you give the warnings, then subsequent statements come in with a high presumption of voluntariness. And they wanted to cut short all of this voluntariness stuff. In other words, it was, there were a whole lot of, several different rationales for Miranda. But one of the rationales was, we're tired of all this totality of the circumstances stuff as to what was the age, what was the condition of the room, how long was the interrogation, what was the sophistication of the defendant. And they wanted to replace it with something that was simple. The warnings were given. And then you go forward. The presumption, its statements made in the aftermath of the warnings, assuming the warnings were given and there's no dispute that they were here, that carries those incriminating comments there after that point, just carry a very strong presumption that they were voluntary. Your Honor, that's true. But Missouri v. Sabert specifically tells us that there is a category of situations where one can give the warnings in a way that is meaningless, in a way that is vacant of any power to enable the person to exercise their rights. And that's what happened here. And to the extent that the goal is to avoid a voluntariness kind of issue, that that's what Miranda was intended to resolve. And I apologize, my time is about to run if I may just finish. Thank you, Your Honor. With the decision in Mashburn accepting Justice Kennedy's concurrence as the controlling opinion in Sabert, we are across that bridge at least to the point where we do need to do some factual evaluation of whether there was an intentional two-step process and whether it was cured. Thank you. We thank you. And we also have your brief on the traffic stop in the Fourth Amendment. You don't have a way of issues by not raising them all at oral argument. You briefed it and we accept that as well. Thank you, Your Honor. Okay. Ms. Dwyer, let's hear from you, please. Yes, Your Honors. Good morning. And may it please the Court, Debbie Dwyer, on behalf of the government. I'd like to start off, Your Honor, just by clearing the record just a bit. The three statements that are at issue and that occurred in this order are, I can I think that's very clear from the record. I don't think it's ever been disputed that those are the three statements and that is the order in which they were given by the defendant voluntarily while on the way to the police station without any questioning from any of the officers in the car. It's the government's position that the trial court in this case was correct in determining that those initial statements were voluntary and they were not the result of any custodial interrogation and that the officers' follow-up question, which quite frankly we submit to the court, is a question of clarification, not an interrogation, not a question designed to elicit an incriminating response. The question was, what do you mean? And the response to that was, I can get you a gun. Correct, Your Honor. It wasn't, I have a gun. That is correct. It was, I can get you one. That is correct, Your Honor. And Judge Blake below, in her ruling, said that, as Your Honor did, Judge Duncan, that that is not necessarily an incriminating response. And quite frankly, it's never been the government's position that that is an incriminating response. That response could mean... But even if it had been, would that lead to suppression? No, Your Honor. No, Your Honor. We have evidence on this record that this is a case analogous to the Siebert decision, Missouri v. Siebert, wherein the officers deliberately, deliberately asked questions without the benefit and protections of Miranda to get an incriminating response and then deliberately gave the Miranda warnings. At that point, I think it's very clear that we can't expect a suspect to understand those warnings at that point and to actually, after giving incriminating information, expect someone to say, okay, I will now invoke. The statement itself could have made anything. It could have referred to a dozen different things out there. Of course, Your Honor. And that's just what I was saying to Judge Duncan. Quite frankly, I can get you a gun may very well mean I know where one is stashed or I know someone who is in illegal possession of that firearm. It does not necessarily mean I have it. It is not respectfully an incriminating response that Miranda is designed to protect. And that's been the government's position from the beginning. It is our position now. We believe Judge Blake, the trial court, got this issue correct in finding as a matter of law that those statements were voluntary and were not the result of a questioning designed, deliberately designed, to elicit an incriminating response. If Your Honors have no questions on that issue, I'll move on. If you'd like argument, I have that prepared on the issue of probable cause for the stop. On the traffic stop, the tag was not visible, was it? I mean, it was almost a temporary tag. People have temporary tags all the time, but they're supposed to be legible. Correct. As I understand, the license plate number was just not legible. Yes, Your Honor, and the evidence that was produced at the motions hearing was that the tag was folded from the bottom to the top in such a manner... Did it seem like a deliberate fold to avoid, so that people couldn't identify the car? I don't think so, Judge. I don't think there's any evidence on the record that the folding of the tag was deliberate. In fact, one of the officers testified that... For purposes of the stop, what difference would that make? It does not. It does not. And the district court credited the testimony of the officers that the tag was bent, and it would be hard to say that was clear error. I agree with you, Your Honor. I agree with you. Yeah, we don't go behind credibility determinations. That's correct, and as Your Honor correctly points out, Judge Blake did find that all three officers were credible. In fact, she found Detective Mackinson was credible on that point. He had written the statement of probable cause. He obviously had testified at the hearing, and you are correct, Your Honor, that there's certainly no clear error in Judge Blake's ruling on that issue. The defendant made a point here of the fact that the gentleman's father got to drive the car home. Yes, Your Honor. But as long as the stop was valid, then they approach the car, and they smell marijuana, and it becomes, instead of a minor traffic violation, a drug violation, there's nothing that would prohibit the officers from reacting to that because they then had probable cause for an arrest. And the fact that the father was allowed to drive the car home, they decided to deal with a more serious legal infraction rather than the more minor legal infraction, and we would be working an odd wrinkle in Fourth Amendment law if we said that after a traffic stop, the sole focus of police activity thereafter had to exclusively focus on the reason of the stop. I agree, Your Honor. I mean, that would be a gigantic change in Fourth Amendment law. You can stop for one reason and arrest for another reason so long as there's probable cause to make that arrest. You're right, Your Honor. I think the government is in complete agreement with your statement that this was a minor traffic offense that just escalated into something else that happens every day. If law enforcement were confined to purely deal with the minor traffic offense and then be on their way, that would work a revolution. Agreed. Agreed. If Your Honors have no other questions of me, thank you very much. Mr. Sarikhan, we'd like to hear from you. Just very briefly, the government referred to the notion of clarification. The cases cited on clarifying questions, which is the sort of question asked here, what do you mean, make it clear that the boundary for a clarifying question comes before what happened here? We see in United States v. Rami, for example, the officers are asking, how do you spell that? What does that acronym you just said mean? What if the officer had said, I'm not sure I heard you? Your Honor, if it's just repeat the same thing you said, that would be fine. But if it's, you've given me ten words, and now I want ten more words that are going into more detail, that's beyond the line. That's beyond the boundary of what's permitted in a clarifying question. So if the officer said, I'm not sure I heard you, and at that point the defendant had said, I can get you a gun. That would be different, Your Honor. Why? Because in that case, what the officer is asking for is, tell me the same thing again. And the defendant then does volunteer more. But here, what the officer is doing is asking for more. Counsel, aren't you slicing this all a little fine? Your Honor. You almost need a chart. I mean, it would be quite medieval, the regime that you would establish. Would it not? Your Honor, to the contrary. This is the regime that the Supreme Court is telling us to have. Just respect the bright line of Miranda. Do it the same way every time. There's been a whole body of law developed around the concept of custody, which isn't at issue here. He's in a cruiser. He's in custody. But also around the whole question of interrogation. And so you have what the Rhode Island v. Ennis rule, which is reasonably likely to elicit an incriminating response. And what that does is it tosses the issue back to district courts, which deal with the infinite variety of factual situations before them. And they make a case-by-case determination as to whether something was reasonably likely to elicit an incriminating response. And it's sort of a mixed question of fact law. But there is a considerable degree of deference of a district court on that kind of thing. It may not be a pure question of fact. As I say, it's mixed. But whether something is reasonably likely to elicit an incriminating response does have an element of credibility determination to it. The person that listens to the actual officer testimony has a better sort of lens on the scene than I think we do. So Rhode Island v. Ennis, it kind of lights the way for district courts to take an important role in puzzling out how you apply the standard in a myriad of different situations, one of which we have here. Two things, Your Honor. First, as Your Honor says, this is not solely a question of fact. There are factual determinations to be made. But it is not solely a question of fact. And this court does certainly have the power to arrive at a different conclusion. In addition, to respond to Your Honor's concern about kind of slicing, and are we slicing too fine, the slice happens way back at the beginning. It says there's these little category of questions that are okay. All the rest of this stuff is interrogation, and you have to give the warnings first. I also just wanted to mention very briefly the word necessarily was used again. It's very tempting to use that word. He wasn't necessarily going to say anything inappropriate or something self-incriminating. But necessarily is not the test. Natural is not the test. The test is whether it was reasonably likely. And reasonably likely, it's something below, beyond a reasonable doubt, below clear and convincing, below preponderance, below probable cause. It's way down low. It just needs to be. Now we've got a little hierarchy in addition to all the rest, and you're not slicing it too fine? You've got a chart somewhere that you wish you could include. I would be happy. The most refined explication of Fourth Amendment. And I admire your inventiveness here. But all these different categories and all these different rules, I'm not quite sure how they translate to the street. Your Honor, I see I'm out of time. If I may just have 15 minutes just to respond. 15 seconds. I apologize. That's how zealous I am, by golly. You have more than 15 seconds. Thank you, Your Honor. But not 15 minutes. I understand, Your Honor, yes. Your Honor, the way it should translate to the street is give the warnings every time. Just do it. And the gamble in this case, it was said below there was a gamble by Mr. Johnson. There was a gamble on the part of the officers, too, that this would be okay. And we urge the court to find that it is not. In other words, Miranda strikes police officers dumb except for giving the warnings. There's virtually nothing else that they can say, no other interaction, just the warnings. And then after that point, they're struck mute. To the contrary, Your Honor, there's many things they can do, but when you want information out of someone, that's the lie. Okay. Thank you. All right. We will adjourn court and come down and greet counsel.
judges: J. Harvie Wilkinson III, Allyson K. Duncan, G. Steven Agee